**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. CR 06-1079 RB |
| ) | |
| LUIS EDGAR MONTES-RAMOS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** came before the Court on Defendant's (Montes') Motion to Suppress Evidence (Doc. 10), filed on May 29, 2006. On July 6, 2006, I held a hearing, received evidence, and heard arguments. Having considered the record, evidence, arguments of counsel, and being fully advised, I grant the motion as to the roadside statement, but otherwise deny the motion.

**I. Facts.**

On February 8, 2006, Hidalgo County Sheriff's Deputy Robert Rodriguez was parked on the southbound shoulder of Highway 80 at mile marker 24. Highway 80 is a two-lane road running north/south from the international border area near Douglas, Arizona, through the remote bootheel section of southwestern New Mexico to Interstate 10, about 14 miles west of Lordsburg, New Mexico. (Gov. Ex. 10.) Mile marker 24 is located within New Mexico, about 70 miles from the international border with the Republic of Mexico, and 30 miles from Lordsburg, New Mexico. (*Id*.) Highway 80 is a known drug-smuggling route.

Deputy Rodriguez was monitoring traffic speed with radar. He was alone in his patrol car. His closest back up was in Lordsburg. At approximately 11:41 a.m., a gold Volvo sedan passed

Deputy Rodriguez's position headed north. In his rearview mirror, Deputy Rodriguez observed that the Volvo did not display a license plate. The Volvo was not speeding.

Deputy Rodriguez executed a U-turn and followed the Volvo. After he caught up to the Volvo, Deputy Rodriguez followed it at a distance of one-and-a-half car lengths. Deputy Rodriguez observed a piece of paper attached to the Volvo where the license plate would otherwise be located, flapping horizontally in the wind. Due to the fluttering, Deputy Rodriguez was unable to determine whether the paper was a valid temporary registration permit. In addition, it appeared that the paper might detach from the Volvo. Deputy Rodriguez turned on his emergency equipment and stopped the Volvo.

After the Volvo stopped, the paper stopped flapping and came to rest in a vertical position. As Deputy Rodriguez stopped his patrol car behind the Volvo, he observed that the paper was an Arizona temporary registration permit. (Gov. Exs. 3 and 9.) The temporary permit was encased in a clear plastic envelope. (Gov. Ex. 9.) The thickness of the plastic envelope was equivalent to that of a freezer storage bag. Someone had pierced a hole in each top corner of the plastic envelope, and attached it to the Volvo with the two bolts designed to hold a metal license plate. The bottom of the plastic envelope was not attached to the car. The plastic envelope, and the enclosed temporary permit, fluttered in the wind when the car was in motion because the bottom edge was not attached to the car and the plastic was flexible.

Deputy Rodriguez was able to read the temporary permit as he approached the Volvo on foot only because the car was stationary. The windows of the Volvo were not tinted or dirty. (Gov. Ex. 3.) The temporary permit would have been clearly visible had it been affixed to the inside left rear window and would not have presented a safety hazard.

Deputy Rodriguez approached the Volvo on the passenger side for officer safety reasons. The front window on the passenger side was open. Montes was the driver and only occupant of the Volvo. Deputy Rodriguez advised Montes in Spanish that the temporary permit needed to be affixed inside the left rear window and asked for his license and registration. As he spoke to Montes, Deputy Rodriguez observed a five-inch, circular section of burlap in the area behind the front passenger seat, protruding from under a leopard-skin patterned blanket. The blanket covered the rest of the back seat and appeared to conceal large items. (Gov. Exs. 2, 3 and 6.) Deputy Rodriguez believed that the burlap and the large items concealed by the blanket were consistent with drug trafficking.

During his sixteen years in law enforcement, Deputy Rodriguez has been involved in a dozen drug busts. Two of these busts involved the transport of contraband in burlap. Deputy Rodriguez acknowledged that burlap is commonly used to transport onions, chile, and potatoes in southwestern New Mexico. However, the bundles under the blanket were not consistent with packaging for agricultural products; they were consistent with packaging for contraband. The bundles were bulky and filled the backseat to the top of the rear of the backseat. (Gov. Exs. 2, 3 and 6.)

While Montes was still locating his documents, Deputy Rodriguez leaned about two inches inside the passenger window of the Volvo. His purpose in leaning into the vehicle was "for assurance" that contraband was hidden under the blanket. Deputy Rodriguez immediately detected a strong odor consistent with marijuana. Deputy Rodriguez recognized the odor of marijuana from his training and experience. Deputy Rodriguez did not smell marijuana before he leaned into the vehicle.

Deputy Rodriguez drew his service weapon, pointed it at Montes, instructed Montes to place the Volvo in park, toss the keys outside the window, exit the car, and walk around the front of the

3

car to the shoulder area. Montes complied with Deputy Rodriguez's requests.

When Montes reached the shoulder, Deputy Rodriguez ordered Montes to kneel and handcuffed him. Deputy Rodriguez asked Montes what was in the vehicle. Montes stated "marijuana." Consent to search was not requested or given. Deputy Rodriguez placed Montes in the patrol car, advised Montes of his Miranda rights, and called for back up.

While waiting for back up to arrive from Lordsburg, Deputy Rodriguez opened the rear left door of the Volvo, moved the blanket, and observed several large bundles of burlap. Deputy Rodriguez pierced one of the bundles and observed a green, leafy substance consistent with marijuana.

After back up arrived, Montes and the Volvo were transported to the sheriff's office in Lordsburg. A search of the vehicle revealed five burlap bundles in the vehicle (three in the passenger compartment and two in the trunk), which contained a total of 211 pounds of marijuana.

At approximately 6:00 p.m., ICE agents Larry Lutonsky and Alberto Chavez advised Montes of his Miranda rights in Spanish. Montes acknowledged that he understood his rights and agreed to waive them to make a statement. Montes admitted knowing the marijuana was in the Volvo and gave additional incriminating information.

Montes moves to suppress the evidence on the grounds that (1) the stop was not justified at its inception; and (2) Deputy Rodriguez exceeded the scope of the stop by leaning his head inside the window. He moves to suppress all evidence and statements as the "fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471 (1963) and *Dunaway v. New York*, 442 U.S. 200 (1979).

**II. Discussion.**

The Fourth Amendment prohibits unreasonable searches and seizures by the Government.

U.S. CONST. amend. IV.  Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

A traffic stop is reasonable under *Terry*, if (1) "'the officer's action was justified at its inception,'" and (2) the officer's action "'was reasonably related in scope to the circumstances which justified the interference in the first place.'"  *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir.1995) (en banc) (*quoting Terry*, 392 U.S. at 20).  The first question is whether the stop was justified at its inception.

A traffic stop is justified at its inception "if the stop is based on an observed traffic violation." *Botero-Ospina*, 71 F.3d at 787.  Deputy Rodriguez observed a piece of paper attached to the Volvo where the license plate would otherwise be located and was unable to determine whether the paper was a valid temporary permit.  New Mexico law provides:

> B. Temporary demonstration plates and temporary permits shall be firmly affixed to the inside left rear window of the vehicle to which it is issued, unless such display presents a safety hazard or the temporary permit is not visible or readable from that position, in which case, the temporary permit shall be displayed in such a manner that it is clearly visible from the rear or left side of the vehicle.

N. M. Stat. Ann § 66-3-18 (B) (Michie 2004).

The temporary permit was not affixed to the inside left rear window of the Volvo, but attached to the back of the car so that it was unreadable when the car was in motion.  The rear window of the Volvo was untinted and clean.  If the temporary permit had been affixed to the inside of the rear window, it would not have presented a safety hazard and the permit would have been clearly visible from that position.  The temporary permit was not displayed in accordance with state

5

law.  Because the stop was based on an observed traffic violation, the stop was justified at its inception.

The next question is whether the scope of the stop was reasonably related to the circumstances that justified the stop.  *Botero-Ospina*, 71 F.3d at 786.  The Tenth Circuit recently addressed the scope of a traffic stop initiated to ensure the validity of a vehicle's temporary registration permit in *United States v. Ledesma*, 447 F.3d 1307, 1312 (10th Cir.2006).  Generally, in such cases, the question of whether the detention exceeded the scope of the underlying justification depends on whether the officer is able to verify the validity of the temporary permit as he approaches the vehicle on foot.  *See id.*  Although Deputy Rodriguez was able to read the temporary permit when the Volvo was stationary, the temporary permit was unreadable when the vehicle was in motion and otherwise not displayed in accordance with New Mexico law.  *See* N. M. Stat. Ann § 66-3-18 (B). Under these circumstances, it was reasonable for Deputy Rodriguez to continue with a routine traffic stop.

 "A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."  *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir.2005) (*quoting United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997)).  During the stop, an officer may ask routine questions about the driver's travel plans.  *Id.* (*citing United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir.2001)).

As Deputy Rodriguez advised Montes about the problem with the temporary permit and asked for his license and registration, Deputy Rodriguez observed, from his location outside the passenger door of the Volvo, the burlap and the blanket covering large items.  Deputy Rodriguez then leaned two inches inside the Volvo to sniff for contraband.  Although the detention was not prolonged,

6

Montes argues that Deputy Rodriguez exceeded the bounds of his authority when he leaned inside the vehicle and sniffed for assurance that the large items under the blanket were bundles of marijuana.

"Unless the officer has an objectively reasonable suspicion that illegal activity unrelated to the stop has occurred or the driver otherwise consents to the encounter, the resulting detention is reasonable only so long as the officer's subsequent conduct is reasonably related in scope to the circumstances which justified the initial stop." *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir.2006) (*citing United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir.2005) (Brack, J., sitting by designation)). Montes did not consent to a search of the Volvo. The question is whether Deputy Rodriguez had reasonable suspicion of illegal activity.

At the time that Deputy Rodriguez leaned inside the vehicle, the following factors supported a finding of reasonable suspicion: the location was about 70 miles from the border on a known drug smuggling route; Montes was driving away from the border; the vehicle displayed a temporary permit in violation of state law; a five-inch section of burlap was visible in the back seat area behind the passenger seat; and a blanket concealed large items in the backseat that filled the backseat up to the level of the top of the rear of the backseat and appeared to be bundles of marijuana. Based on these factors, reasonable suspicion justified this detention, which could not have lasted more than one minute. The question is whether Deputy Rodriguez ran afoul of the Fourth Amendment when he leaned two inches inside the vehicle to sniff for marijuana.

Although there is a lesser expectation of privacy in a vehicle as opposed to a residence, *United States v. Morales-Zamora*, 914 F.2d 200, 205 (10th Cir.1990), "[p]eople have a reasonable expectation of privacy in the interiors of their automobiles. . . ." *United States v. Stone*, 866 F.2d 359, 363 (10th Cir.1989). The Fifth Circuit has observed that when an officer leans inside an open

7

car window to detect an odor he "intrude[s] inside a space that, under most circumstances, is protected by a legitimate expectation of privacy." *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir.1993). However, the Fourth Amendment is not offended if that intrusion is objectively reasonable under the circumstances. *Id*. The question becomes whether Deputy Rodriguez's intrusion was objectively reasonable under the totality of the circumstances.

"Reasonableness is the 'touchstone' of a Fourth Amendment analysis . . . ." *United States v. Tibbetts*, 396 F.3d 1132, 1139 (10th Cir.2005) (*quoting United States v. Holt*, 264 F.3d 1215, 1230-1231 (10th Cir.2001)(en banc)). Reasonableness depends on the degree that police action intrudes upon a reasonable expectation of privacy and the degree that such action is necessary to promote legitimate governmental interests. *United States v. Denny*, 441 F.3d 1220, 1224 (10th Cir.2006) (*citing Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999)). A balancing of these expectations and interests guides the determination of reasonableness under the Fourth Amendment. *Denny*, 441 F.3d at 1224 (*citing Whren v. United States*, 517 U.S. 806, 817 (1996) (explaining that while not always apparent, every Fourth Amendment case in principle involves a balancing of all relevant factors)).

Under these circumstances, Deputy Rodriguez had an objectively reasonable and articulable suspicion that the Volvo contained narcotics. Deputy Rodriguez was alone and 30 miles from back up when he realized that he faced a potential drug smuggler. Concerns for officer safety may justify a limited search of a vehicle. *See New York v. Class*, 475 U.S. 106, 116 (1986); *United States v. Hishaw*, 235 F.3d 565, 570 (10th Cir.2000) (holding that a reasonable suspicion that the defendant "was distributing drugs . . . also indicated that he might be armed and dangerous" based on the connection between drug trafficking and weapons); *United States v. Shareef*, 100 F.3d 1491, 1502

8

(10th Cir.1996) (holding that, during an investigatory detention, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo). Although this is a close case, the balance tips in favor of the governmental interests in officer safety and drug interdiction.

Deputy Rodriguez could have prolonged the encounter and waited for the odor to waft out, but the potential danger would have increased in direct proportion to the length of the encounter. The Court is reluctant to second-guess a seasoned law enforcement officer on such a close call. The intrusion was minimal and was substantially outweighed by concerns for officer safety in light of the reasonable suspicion that Montes was engaged in smuggling a large quantity of marijuana. Deputy Rodriguez's actions were objectively reasonable under the totality of the circumstances and within the range of activities that a police officer may permissibly engage in when he has reasonable suspicion to believe that a vehicle contains narcotics.

Combined with the other suspicious factors discussed above, the detection of the odor of marijuana was sufficient grounds upon which to detain Montes. *United States v. West*, 219 F.3d 1171, 1178 (10th Cir.2000); *United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir.1999). After Deputy Rodriguez smelled the marijuana, there was probable cause to arrest Montes and search the Volvo.

The Government concedes that Montes was in custody and had not been advised of his Miranda rights when he made the roadside statement. The Court finds that the roadside statement was given in violation of the Fifth Amendment. That statement will not be admitted at trial. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000). Montes does not contest the validity of the later statement given to the ICE agents.

9

### III. Conclusion.

The actions of Deputy Rodriguez did not violate the Fourth Amendment.

**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence, filed on filed on May 29, 2006, is **GRANTED AS TO THE ROADSIDE STATEMENT, BUT OTHERWISE DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**